GIBSON DRILLING CO., et al., Appellants,

v.

B & N PETROLEUM INC., et al., Appellees.

No. 12-84-0238-CV.

Court of Appeals of Texas, Tyler.

Jan. 30, 1986.

Rehearing Denied Feb. 27, 1986.

Rex A. Nichols, Nichols, Merriman, Patterson & Allison, Longview, for appellants.

Robert A. Anderson, Longview, for appellees.

COLLEY, Justice.

In this summary judgment case, the trial court rendered a judgment on the motion of plaintiffs/appellees, William Lester Mackey and thirteen other members of the Mackey family, declaring that an oil and gas lease dated March 16, 1978, executed by Mackey as lessor to Gibson Drilling Company, defendant/appellant, a partnership as lessee had terminated at the expiration of its primary term as to tracts 1–12, and the east 25.5 acres of Tract 13 described therein because no production of oil or gas was obtained to continue the lease in force. We affirm.

In July and August 1976 Mackey executed three counterpart oil and gas leases to Ward, Trustee, as lessee. These leases covered thirteen separate tracts of land aggregating 779.35 gross acres. Each lease contained the following provision, to wit: "Lessors reserve unto themselves all oil, gas and other minerals lying below the base of the Travis Peak Formation or structure." Gibson acquired these 1976 leases, and on June 7, 1977, filed a unit declaration creating a gas unit designated as the L.L. Mackey Estate Gas Unit No. 1. The 1976 leases and all tracts covered thereby, except Tract No. 11, 62.55 acres (called 62.45 acres), the east 102.8 acres of Tract No. 1, and the east 25.5 acres (called 26 acres) of Tract No. 12 [1] were committed

to the unit. The declaration purports to "pool [and] unitize said oil, gas and mineral leases insofar and only insofar, as they cover production from all zones and formations lying below the base of the Woodbine Formation *to the base of the Travis Peak.*" (Emphasis added.) The summary judgment evidence shows that two wells were drilled and completed in the Travis Peak Formation as producers of gas in the Mackey Unit, and that such wells were still producing in paying quantities as of the date of the filing of the lawsuit.

On March 16, 1978, Mackey as lessor executed an oil and gas lease to Gibson as lessee covering the identical tracts described in the 1976 leases and three additional tracts described as Tract Nos. 14, 15 and 16 in the 1978 lease. However the thirteen tracts of land described in the 1978 lease were described as twelve tracts in the 1976 lease.[2] The 1978 lease contains the following provisions which are germane to our decision:

Paragraph 4 reads in part:

Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance ... [in the event of gas production].

Paragraph 12 of the lease reads:

This lease will be for a primary term of one year and if drilling operations have commenced within the one year term and pursued continuously without cessation for more than ninety (90) consecutive days to the completion of said well, whether it be a producers [sic] or dry

1. Tracts are numbered as they appear in the 1976 leases.

2. There were two number three tracts in the 1976 leases.

hole, the lease will then be automatically extended for a successive one year period. If drilling operations have commenced on the second well before the end of the second year and pursued continuously without cessation of more than ninety (90) consecutive days, to the completion of said well, whether it be a producers [sic] or dry hole, the lease will then be automatically extended for a third successive one year period and so long thereafter as oil and gas is produced in paying quantities. At the end of the three year period any lands that are not included in a pooled unit from which oil and gas is being produced in paying quantities shall be released and title herein shall revert to mineral owners.

Paragraph 14 reads as follows:

This lease, as to Tracts 13, 14, 15 and 16 shall be covered in depth from the surface of the earth down to unlimited depths. As to Tracts 1 through 12, this lease covers only oil and gas rights below the base of the Travis Peak Formation.

Paragraph 18 of said lease reads as follows:

Notwithstanding anything to the contrary herein contained, drilling operations on, or production from a pooled unit or units established under the provisions of Paragraph 4 hereof embracing land covered hereby and other land, shall maintain this lease in force only as to the land included in such unit.

On August 17, 1979, Gibson filed a unit declaration creating the Gibson Drilling Company-James N. Adams Gas Unit No. 1 comprising some 287.37 acres which included the 1978 lease and the east 102.8 acres of the 145-acre tract described therein as Tract No. 1. On September 9, 1979, a gas well was completed as a producer in this unit. It was producing gas in commercial quantities at the time of the filing of this suit.

On April 4, 1980, Mackey signed an agreement purporting to ratify the 1978 lease. The agreement recited that its purpose was

To resolve any questions which may have arisen or which may arise concerning the ownership of the properties hereinafter listed or the capacity in which the various leases were taken, and particularly, as it may concern the ownership of trust properties for which various trusts have terminated; ....

And such ratification agreement also recites:

NOW, THEREFORE, in consideration of the premises and of One ($1.00) Dollar and other good and valuable considerations all cash to us in hand paid by GIBSON DRILLING CO. (herein called 'Lease Owner'), the receipt of which is hereby acknowledged and confessed, we, the said [Mackeys] do hereby Adopt, Ratify and Confirm said leases and all of their terms and provisions, as amended herein, and do hereby Let, Lease and Demise the lands and premises listed in said leases unto Lease Owner for as long *hereafter as there is production of any one or more of the minerals subject to said leases from any well or well which may presently or hereafter be located on the lands described in said lease or lands pooled therewith,* or said leases are otherwise maintained in accordance with their terms and provisions and production from completion, recompletion or operations upon any existing well or wells on the above described properties pooled therewith shall be considered, for all purposes, as though said wells had been commenced and drilled in accordance with the terms and provisions of the above mentioned leases as herein amended. (Emphasis added.)

The summary judgment evidence is undisputed that Gibson has never completed a producing oil or gas well in a formation located below the base of the Travis Peak Formation on any of the tracts involved. The affidavit of R.L. Gibson, the principal owner and managing partner of Gibson, filed in opposition to Mackeys' motion for summary judgment, alleges in part: "Gibson Drilling Co. has received no written notice from Plaintiffs Mackey Family that

it and its assignees were not in compliance with Paragraph 9 [3] of the 1976 Leases or the 1978 Lease."

A copy of an oil, gas and mineral lease dated October 3, 1983, executed by Mackey as lessor in favor of appellee B & N Petroleum, Inc., as lessee, is attached to Mr. Gibson's affidavit. The lease covers the identical oil and gas estate conveyed by Mackeys' 1978 lease to Gibson in the first twelve tracts of land.

We will discuss the first three points together. In essence, Gibson claims that the two gas wells completed on L.L. Mackey Estate Gas Unit No. 1 perpetuated the 1978 lease because the wells were drilled and completed and were producers from the same *lands* or lands and leases pooled therewith. Gibson argues in effect since it acquired the oil, gas and mineral leasehold estate to the base of the Travis Peak by the 1976 leases, and the oil and gas leasehold estate as to all formations below the base of the Travis Peak formation under the 1978 lease, that production obtained from any horizon holds the 1978 lease in full force and effect as long as production continues. While Gibson does not expressly argue that the two leasehold estates under the same surface acres became one leasehold estate under the doctrine of merger, the implication of its argument is just that. Additionally Gibson contends that since Paragraph 4 of the 1976 leases and the 1978 lease were identical and provide that the lessee had the right to pool or unitize any lands covered by the lease with any other lands, lease or leases "as to any or all minerals or horizons ... [and to establish or enlarge units] as to any one or more horizons ...," production of gas from the Mackey and Adams Gas Units from the Travis Peak Formation kept the 1978 lease in force as to all tracts covered thereby.

Gibson cites *Rist v. Westhoma Oil Company*, 385 P.2d 791 (Okla.1963), in support of its argument. Our research reveals that only one Texas appellate court has approved and applied the holding in *Rist. See Friedrich v. Amoco Production Co.*, 698 S.W.2d 748, 754 (Tex.App.—Corpus Christi 1985, no writ). These cases are clearly distinguishable on their facts. In both *Friedrich* and *Rist*, the original lease made no horizontal severances of the oil and gas in place. The lessees did so by assignments, severing the oil and gas estate into two horizons: in *Rist*, one above sea level and the other below sea level, and in *Friedrich*, one from the surface to a depth of 1298 feet, and one at all depths below 1298 feet. In both cases, the courts held that production of the leased substances from one horizon kept the lease in force as to all horizons. Such is not the case before us. The leases here involved each made horizontal divisions of the oil and gas estate underlying the common tracts.

The questions presented for decision by Gibson's first three points may be stated thus: Does the doctrine of merger operate to merge the leasehold estates created by the 1976 and 1978 leases? And if not, do the provisions of the pooling clause or the ratification agreement release Gibson from the contractual provisions of the 1978 lease to drill and secure production of oil and/or gas from formations below the base of the Travis Peak Formation in order to extend the lease beyond the primary term? We conclude that the answer to each question is no.

As early as 1915 the Texas Supreme Court held that oil and gas in place constitutes realty, and that an oil and gas lease covering said minerals in place amounts to a defeasible or determinable

---

**3.** Paragraph 9 reads in part:

In the event lessor considers that lessee has not complied with all its obligations hereunder, both express and implied, lessor shall notify lessee in writing, setting out specifically in what respects lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by lessor. The service of said notice shall be precedent to the bringing of any action by lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on lessee.

fee therein. *Texas Company v. Daugherty*, 107 Tex. 226, 176 S.W. 717 (1915). It is also a rule of long-standing that the mineral estate may be severed horizontally or vertically from the remainder of the fee title to realty. *Humphreys-Mexia Company v. Gammon*, 113 Tex. 247, 254 S.W. 296, 301 (1923). The doctrine of merger of estates has no application to a horizontal division of realty. *Humphreys*, 254 S.W. at 301. Horizontal divisions of the oil, gas and other minerals under a tract of land creates estates of equal dignity. There is no lesser and greater estate involved. A horizontal severance of minerals can only be accurately described by identifying the surface tract (vertical severance) and the horizons below the surface intended to be conveyed or reserved. *Norsworthy v. Hewgley*, 234 S.W.2d 126, 128 (Tex.Civ. App.—El Paso 1950, writ ref'd). The 1976 leases and the 1978 lease conveyed two separate determinable fees in the oil, gas and mineral estate underlying the surface area of the tracts common to such leases. No merger of these mineral fee estates occurred. *Humphreys-Mexia Company v. Gammon*, 254 S.W. at 301.

Gibson's claim that a material fact issue was created by the ratification agreement which precluded the entry of a summary judgment is without merit. Gibson alleges the ratification agreement effected an amendment to the 1978 lease, releasing Gibson from securing production of oil and gas from formations lying below the base of the Travis Peak. We do not so construe the ratification agreement. A careful reading thereof, and particularly the phrase, "[w]e ... do hereby let, lease and demise the lands and premises listed in said leases unto [Gibson] ... for as long hereafter as there is production of any one or more of the minerals subject to said leases....," demonstrates that no such amendment was intended. Neither can the ratification agreement be construed to enlarge the Mackey Unit so as to include such oil and gas horizons under the plain terms of the agreement. Gibson argues that when the

1976 lease, the 1978 lease and the ratification agreement are read together, Gibson was only required by the 1978 lease provisions to drill three wells in units which included the surface tracts of land without regard to the depth of the completed wells. Gibson also urges us to construe the language of Paragraph 18 [4] of the 1978 lease, and particularly the language, "shall maintain this lease in force only as to the land included in such unit," as permitting the 1978 lease to be held by production of gas from a formation above the base of the Travis Peak as to all the tracts described therein.

■ Gibson did not allege in its opposition to the summary judgment motion that any provision of the 1978 lease was ambiguous. In the absence of an ambiguity, the construction of the provisions of the lease is a question of law. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962). The lease must be considered in its entirety, and we must not look to any single provision that of as controlling. *Myers, supra.* Our clear duty is to ascertain and give effect to the true intention of the parties. *R & P Enterprises v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 518 (Tex.1980). And in so doing, we will construe the 1978 lease in such a manner as to give such meaning to the language used that would harmonize all of the provisions thereof. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d at 197. Applying these established rules of construction, we conclude from our study of the 1978 lease in its entirety that the pooling clause (Paragraph 4) of the lease only authorized Gibson to "pool or unitize" the lease as to the oil and gas in place under tracts 1–12 inclusive lying below the base of the Travis Peak Formation with "any or all [oil and gas]" found at "any one or more horizons" *below the base of the Travis Peak Formation.* Any other construction of the pooling clause would render it repugnant to the granting clause of the 1978 lease which clearly conveyed as to tracts 1–12 only a determinable fee inter-

4. See page 824 of this opinion.

est in the oil and gas in place at depths below the base of the Travis Peak Formation underlying these tracts. Since Gibson was not authorized to pool the 1978 leasehold estate with other lands or leases to form units for the production of gas from any gas bearing formations or structures located at any depth above the base of the Travis Peak Formation, the gas production from the Mackey and Adams Unit did not extend the 1978 lease beyond its primary term which ended on March 16, 1979. And while the lease was temporarily revived by the ratification agreement on April 4, 1980, no production of minerals subject to the 1978 lease was ever had. Hence, the 1978 lease terminated on April 4, 1980. Because of our construction of the pooling clause, an interpretation of the so-called "Pugh" clause is unnecessary and immaterial. Points 1, 2 and 3 are overruled.

■ By point 4 Gibson claims that Paragraph 9[5] required Mackey to give sixty days' previous notice to Gibson of its failure to comply with the lessee's obligations under the lease before this suit could be prosecuted. The point is meritless. Plaintiff's suit and his motion for summary judgment sought a declaratory judgment that the 1978 lease had terminated by reason of its own terms and provisions, that is, that the primary term had expired and the lease was not held by production or drilling operations. Mackey did not seek a forfeiture of the lease because Gibson had defaulted in the performance of any of its obligations under the lease. The notice provision is not applicable. *Waggoner & Zeller Oil Co. v. Deike*, 508 S.W.2d 163, 165–166 (Tex.Civ.App.—Austin 1974, writ ref'd n.r.e.). Point four is overruled.

■ By point five Gibson claims that the court erred in declaring a termination of the 1978 lease insofar as it covered the east 102.8 acres of Tract No. 1 described in the 1978 lease because the lease was kept in force as to said tract by the unit production from the James N. Adams Gas Unit. Gibson argues that since the Adams Unit was created as to unlimited horizons, the production from the Travis Peak Formation perpetuated the 1978 lease as to the 102.8 acres. We do not agree. For the reasons already stated, the inclusion of the 102.8-acre tract as to all horizons above the base of the Travis Peak Formation in the Adams Unit was not authorized by the pooling clause of the 1978 lease. Point 5 is overruled.

■ By point six Gibson claims the court erred in granting the summary judgment regarding the east 25.5 acres (called 26 acres) of Tract 13 of the 1978 lease, consisting of 49 acres.[6] Gibson argues that since Mackey signed a "top lease" to B.V. Long, Trustee,[7] dated February 11, 1978, covering the east 25.5 acres of said 49-acre tract, it was relieved of "performing its obligation under [the 1978 lease]." This point must fail because it is not factually supported by the record. The Long lease was signed *before* Gibson took its 1978 lease from Mackey, and the leasehold estate acquired by Long in the 25.5 acres was "limited in depth from the surface of the earth down to and including the base of the Travis Peak Formation."[8] (Paragraph 13, B.V. Long lease) In other words, the Long lease does not cover any of the horizons of oil and gas in place underlying the tracts covered by Gibson's 1978 lease from Mackey. The point is overruled.

The judgment of the trial court is affirmed.

---

5. See note 3.

6. The west 23.5 acres of the 49-acre tract was committed by Gibson to the Mackey Gas Unit No. 1.

7. A copy of this lease was attached to Gibson's opposition to the summary judgment motion.

8. The B.V. Long lease covered tract No. 11 as described in the 1976 lease and two other tracts covered by that lease, none of which were included in either the Mackey or Adams Gas Units.