**TERRY OILFIELD SUPPLY CO., INC., et al., Plaintiffs,**

v.

**AMERICAN SECURITY BANK, N.A., et al., Defendants.**

Civ. A. No. H–91–2926.

United States District Court, S.D. Texas.

April 10, 1996.

company. The conveyance was consideration for two multiple-well drilling contracts. As it emerged from bankruptcy, without consulting Terry the producer canceled the contract rights with the transmission company as part ·of a settlement of a judgment against the transmission company. The reorganized debtor is obliged to pay the drilling contractor for its share of the settlement. Court-approved post-petition conveyances pass property rights that are not affected by the bankruptcy process's later events; debtors in possession are bound by the common-law substance of the transactions they enter.

### 2. *Bankruptcy.*

In 1983 Good Hope Refining Energy, Inc., and several of its related companies petitioned to reorganize in bankruptcy. The reorganized debtor became the TransAmerican companies—TransAmerican Natural Gas, TransAmerican Transmission, and Trans-American Pipeline.

■ A reorganization in bankruptcy allows a corporation to rearrange its obligations, to impose costs on some classes of creditors, and to work toward a viable future. Frequently, as in this instance, after filing its petition, the debtor continues to operate the business while it collects its current assets and historic liabilities so the impossible difference may be allocated among the creditor classes. The operations after bankruptcy and before confirmation are similar to the operations after confirmation.

W. Mark Cotham, Houston, Texas, for Terry Group.

Jacks C. Nickens, Houston, Texas, for Bank Group.

John C. Nabors, Dallas, Texas, for Trans-American Group.

OPINION ON LIABILITY & DAMAGES

HUGHES, District Judge.

### 1. *Introduction.*

Operating as a debtor in possession, a gas producer conveyed to a drilling contractor an interest in gas to be produced 'from and in a gas purchase agreement with a transmission

### 3. *Drilling Contracts.*

As the Good Hope companies, TransAmerican sought bankruptcy protection in 1983. Part of TransAmerican's process of revitalizing itself were projects to drill wells on a mineral property in South Texas. Trans-American had acquired an interest in the minerals under the 4,000-acre La Perla Ranch through a farmout from El Paso Natural Gas. To finance the development of the property, TransAmerican arranged with supply houses for materials and others for services. The companies required that they be compensated for these post-petition expenses in a manner that TransAmerican could not

evade later whether as part of its bankruptcy, its impecuniosity, or otherwise.

In 1984 and 1987, Terry Oilfield Supply Company and TransAmerican agreed Terry would drill wells for TransAmerican in exchange for an interest in a gas contract and production payments out of the gas discovered. The gas produced from several specified wells Terry was to drill was to be the only source of compensation for Terry, and that gas was under the contract between TransAmerican and El Paso Natural Gas. TransAmerican had no corporate liability for the drilling costs; the deal was non-recourse.

> [The TransAmerican companies] for consideration paid by Terry Oilfield Supply Co. grant seventy percent of Net Revenues (a) from production of gas [and] (b) from all proceeds of sale all amounts paid or payable under any contract for the purchase of production attributable to the Lands until [Terry] has received and realized from the production the full amount to which [Terry is] entitled pursuant to the Drilling Agreement.

Assignment of Production Payment, ¶ 1 [ellipses omitted].

TransAmerican was a debtor-in-possession when it contracted with Terry, and the bankruptcy court approved these post-petition contracts.

## 4. *Gas Contract.*

Years before, TransAmerican and El Paso Natural Gas had entered into a gas purchase agreement covering the La Perla wells. Under the contract, El Paso agreed to accept and pay for a defined volume of gas at $5.90 per thousand cubic feet (MCF). If El Paso did not accept delivery of the contract volume of gas, it would still have to pay for the gas that it did not take, with the possibility that it could take delivery in the future. These arrangements are loosely known as take-or-pay contracts. When gas prices plummeted, El Paso stopped accepting deliveries of the full volume and stopped paying the contract price.

TransAmerican sued El Paso in state court. The jury found that El Paso had (a) failed to pay the correct price for the gas it took, (b) failed to take the minimum volume, (c) failed to pay for the gas it did not take, and (d) repudiated the take-or-pay obligations for the future. The jury verdict resulted in a net judgment of $480,309,341. Although TransAmerican could have collected the entire judgment, it chose to settle with El Paso. Under the settlement, El Paso paid TransAmerican $302 million and conveyed it %16 of the La Perla minerals.

## 5. *Terry's Claims.*

Terry claims its portion of the El Paso settlement proceeds because it had an ownership interest in them that the bankruptcy court could not affect.

## 6. *TransAmerican's Claims.*

TransAmerican argues that (a) Terry's only interest was in the gas at the well head as it was produced and (b) Terry lost its right to share in the proceeds from the El Paso litigation because it failed to claim them in the bankruptcy.

## 7. *Production Payment.*

In exchange for drilling the wells, Terry received a percentage of the gas produced from the wells. In Texas, a production payment is an interest in real property. *Sheffield v. Hogg,* 124 Tex. 290, 77 S.W.2d 1021 (1934). In effect, Terry owns a percentage of the gas in place. Because Terry owned a title interest of an undivided percentage of gas, TransAmerican could not also own it. TransAmerican's only claim to the proceeds from the sale of Terry's gas is as Terry's agent. The operator who sells the production of another joint-interest owner in the minerals is merely stakeholder for the non-operator. *Atlantic Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 445 (Tex.App.—Texarkana 1993, writ denied).

A mineral lease in Texas is a determinable fee. It is not a lease or other form of executory contract that a debtor may accept or reject. Because a mineral lease is a fee interest, an assignment of an interest under that lease conveys a real property right not merely a chose in action. *Tennant v. Dunn,* 110 S.W.2d 53, 56 (Tex.1937); *Stan-*

*dard Oil Co. v. Marshall,* 265 F.2d 46, 53 (5th Cir.1959). Of course, these contracts were post-petition so they would not be subject to avoidance in any event.

### 8. *Contract Assignment.*

■ In addition to granting Terry an interest in the gas, TransAmerican assigned Terry an interest in the TransAmerican–El Paso contract. The assignment said:

> Grantee shall receive 60% of Net Revenues attributable to Grantor's working interest of all payments [under] any processing agreement or contract for the purchase of production from the Lands, including payments made under any "take or pay" or other advance payment provisions.

Assignment of Production Payment § 1.02(d) [ellipses omitted].

■ Terry has an intangible property right—an incorporeal hereditament—in the El Paso contract. Just as the contract was property of the estate, the assignment to Terry vested Terry with an ownership interest in the property. If TransAmerican had not assigned an interest in the contract to Terry, the contract would have been personal to TransAmerican, and Terry would have had no interest in it. An assignment as a present payment is a property right; it was a transfer in fee of an undivided share. *Tennant,* 110 S.W.2d at 56; *Standard Oil,* 265 F.2d at 53.

■ An assignment is not a debt; it is full payment for something now, even though the receipt of part of the value may occur in the future. The economic reality is that the present value of the drilling service is exchanged for the present value of the expected income stream from the gas under the contract. TransAmerican had to pay Terry to drill the wells. Terry would not drill them on TransAmerican's credit. To *pay* for the wells, TransAmerican transferred to Terry an undivided interest in the El Paso contract, not as security, but in satisfaction of the price Terry charged. This was all post-petition. When the debtor conveys an interest in a property like including a contract, the transaction is not parallel to its issuing a note secured by a deed of trust on property. A deed of trust is security for the payment of a debt. The assignment was a present payment by conveyance.

### 9. *Well Head.*

■ TransAmerican insists that Terry's interest in the gas only vests when there is production at the well head. It says that the assignment of the gas contract limits Terry's recovery to a share of actual production from the land. TransAmerican argues vehemently that the El Paso litigation proceeds are not production. The actual words in the assignment to Terry say that Terry gets its share of everything "including 'revenues' and 'take-or-pay' payments." TransAmerican cannot honestly read the assignment as it says.

### 10. *Production, Later & Actual.*

■ TransAmerican argues that Terry cannot share in the settlement of the El Paso litigation because receipt of payments under the take-or-pay clause requires, to a limited extent, an offsetting obligation for Terry to allow El Paso to produce gas in excess of its minimum quantities in the future; this later production can be taken without payment until El Paso has accepted deliveries equal to the gas it had paid for without taking. This is sometimes referred to as "make-up" gas. Because El Paso repudiated the contract and settled the suit, no actual obligation to allow future production exists.

Essentially, TransAmerican says that Terry only has a right to be paid for gas that is physically produced, including make-up gas, but that no actual gas was represented in the El Paso settlement proceeds. TransAmerican's argument ignores the contract assignment language in the gas contract. The assignment of the contract revenues is not an ordinary clause in a production payment, and it covers the contract rights for excess payment. Terry needed it to prevent TransAmerican from collecting payments for gas not taken and refusing to pay Terry anything because no gas was produced.

Terry had an interest equal to TransAmerican in not being shut in by El Paso's shifting demand for gas for its transmission customers. The assignment to Terry covers pay-

ments under the El Paso Gas contract to TransAmerican, no matter what form they may take. The value of the El Paso contract to TransAmerican was at least $360 million; Terry owned a substantial part of that contract.

Because Terry owned a property right in the contract, it has an interest in the settlement proceeds from a suit on that contract. TransAmerican had dedicated Terry's gas to a high-priced, long-term contract with El Paso, and it allowed El Paso out of that obligation for $360 million, with TransAmerican keeping all of the money.

In investment real estate terms, this deal is: The owner of a shopping center conveys to the new participant a 70% interest in the land with an assignment of 70% of the anchor tenant's lease. Then the owner alone as original landlord releases the anchor tenant from its above-market-rate lease for a cash payment of several millions of dollars, keeping all the money on the ground that the lump sum settlement is not actual rent.

Terry will recover only the proceeds allocable to the particular undivided interest in the gas contract that TransAmerican granted it.

### 11. *Bankruptcy & Post–Petition Contracts.*

 TransAmerican filed for bankruptcy in 1983, and the court confirmed its reorganization plan in 1987. While in bankruptcy, but before confirmation of the plan, the bankruptcy court expressly approved the drilling contracts in question between Terry and TransAmerican.

TransAmerican claims that, if Terry owns a share of the payment, its ownership rights are merely claims in TransAmerican's bankruptcy. TransAmerican says that a party who enters into a court-approved post-petition contract with the debtor must still file a claim in the pre-petition arrangement to get money from the reorganized debtor.

 Court-authorized post-petition transfers of estate property cannot later be avoided by the debtor-in-possession. The court-approved contract alienates the debtor's property from the bankruptcy estate, and the estate cannot get it back. 11 U.S.C.

§ 549(a)(2)(B). Because the transferred property is no longer a part of the bankruptcy estate, neither the reorganization plan nor the bankruptcy court can affect the transferee's rights to that property. "The bankruptcy court cannot create an interest for the debtor where none exists." *In re Vassilowitch*, 72 B.R. 803, 805 (Bankr.D.Mass.1987) (citing *In re Anne Cara Oil Co., Inc.*, 32 B.R. 643, 647 (Bankr.D.Mass.1983)). *See also In re Latex Drilling Co.*, 11 F.2d 373 (W.D.La. 1926); *In re Billick*, 67 B.R. 670 (W.D.Mo. 1986).

Here, the court approved two post-petition contracts requiring TransAmerican to pay Terry for the wells it drilled by conveying to Terry a real property interest in the El Paso contract. The conveyed interest belonged to Terry. TransAmerican, however, wants to require Terry to defend its title to property it acquired through the bankruptcy as a claim in that bankruptcy. A post-petition conveyance is categorically not subject to the claims process.

It is one thing to assert that the mere existence of a bankruptcy puts people who had pre-petition dealings with the debtor on notice that their property may be challenged in the reorganization, but even Kafka would fail to appreciate the idea that those who have dealt with the debtor in possession are required to participate in every proceeding to assure themselves that the debtor will not mistakenly act as if it still owns the property it has sold.

### 12. *Court "Interpretation."*

 TransAmerican further argues that the bankruptcy court altered Terry's rights under the contract. When the bankruptcy court approved the drilling contracts, it said that Terry's interest was in the gas at the well head. TransAmerican insists this announcement by the court defines Terry's rights, regardless of the contract.

 Despite what the bankruptcy court said, TransAmerican is liable to Terry according to the express terms of the court-approved contract. The bankruptcy court cannot tell the parties what a contract means much less alter it at will. Although the

bankruptcy courts have the power to impair the obligation of pre-petition contracts, it does not have the power to impair post-petition contracts. All it can do is approve or disapprove the post-petition contract. The debtor in possession is liable according to the explicit terms of its contract. *In re Walter's Disposal Service, Inc.*, 73 B.R. 6 (W.D.Mo. 1986); *In re Vassilowitch*, 72 B.R. 803 (Bankr.D.Mass.1987).

Even if the bankruptcy judge, TransAmerican board of directors (including its two retired bankruptcy judges), and creditors' committee did not know what the contracts they approved actually said, they are still bound by the language of those contracts. Bankruptcy is drastic and expensive enough without allowing the debtor and court to approve a contract and later void it on the grounds that they would not have approved if they had bothered to understand it. *See Indemnity Ins. Co. of North America v. W.L. Macatee & Sons*, 101 S.W.2d 553 (Tex.1937); *Federal Deposit Insurance Corp. v. Graham*, 882 S.W.2d 890, 897 (Tex.App.—Houston 1994, no writ).

■ Bankruptcy courts routinely treat oil and gas leases as falling under the trustee's power to reject executory contracts and unexpired leases. In Texas, an oil and gas lease is a fee interest, not a lease, regardless of what bankruptcy lawyers may think. Although "lease" is in the heading of the instrument, and "lease" is in the bankruptcy code, the code provision on executory contracts does not apply to Texas mineral leases. Texas law is clear; Terry got an interest in place—as well as at the well head. If the bankruptcy court misunderstood the effect of what it was doing, then that misunderstanding works to the detriment of TransAmerican, not Terry; TransAmerican was the ward of the bankruptcy court.

If the drilling contracts and assignments had included the phrase "at the well head", Terry's interest would still have been in the gas in place under Texas law, there being no "bankruptcy" oil and gas law. *Texas Co. v. Daugherty*, 107 Tex. 226, 176 S.W. 717 (1915); *Gibson Drilling Co. v. B & N Petroleum Inc.*, 703 S.W.2d 822 (Tex.App—Tyler 1986, writ ref'd).

### 13. Confirmation.

■ TransAmerican puts great emphasis on the bankruptcy court's confirmation of the reorganization plan, a necessary close to the bankruptcy. Terry knew about the bankruptcy and had some interest in it. Terry's property was not property of the estate; therefore, the bankruptcy court had no jurisdiction over Terry's property. The plan cannot modify the way Terry had been paid by the debtor in possession with earlier court approval; Terry's rights in the gas and contract were givens that the plan had to accept. The obligation to pay Terry for the drilling of the wells was met in 1984 and 1987 when Terry was paid through a present conveyance; it happened that the conveyance had an income stream associated with it. The plan cannot rescind a transaction that is completed nor revest TransAmerican with property it assigned as debtor in possession.

■ Because Terry would have been paid in full as an administrative claimant, the economic difference between Terry's filing an administrative claim and having a property interest is that now TransAmerican itself will bear the cost of the wells Terry drilled; if Terry's bills had been an administrative claim, the unsecured creditors would have had to pay Terry.

■ TransAmerican does not dispute Terry's ownership interest in the production at the well head, and it continues to pay Terry for its percentage of the gas produced. TransAmerican does contend, however, that Terry's ownership interest was modified by the confirmed bankruptcy plan. Simply put, the plan cannot furnish anyone rights to what was not property of the debtor's estate; if the confirmed plan purported to vest title to the Chrysler Building in the reorganized debtor, it would have no more effect than an attempt to pass the full settlement value to TransAmerican.

■ The debtor, like every other entity asserting rights to property, is obliged to make sure it has clear title to the assets it thinks it owns. Here, of course, the debtor could not have been confused about the state

of its title because it was the debtor *as debtor* that granted the missing interest to the third party. TransAmerican did not even schedule Terry's interest as an asset.

### 14. *Priority of the Creditors.*

TransAmerican's creditors assert that no matter what rights Terry may have, their rights are superior. The creditors argue that because Terry contracted with TransAmerican while it was in bankruptcy, Terry can get no greater rights than those given to it by the bankruptcy court. The bankruptcy court ratified the drilling agreements and also granted the pre-petition creditors a lien on TransAmerican's assets, including damages from all causes of action, giving the creditors specific rights to the El Paso litigation proceeds. To perfect their interest in the El Paso litigation, the creditors filed a notice of security interest and later released it as part of the settlement. In the drilling contract arrangement the secured creditors subordinated their security interest to Terry's compensation interest.

The creditors are correct, but only to the extent that the property belonged to Trans-American. The 1984 and 1987 drilling agreements conveyed real and intangible property interests to Terry. On plan confirmation, TransAmerican no longer owned the rights it had assigned to Terry. The creditors could perfect a security interest only in Trans-American's interest in the litigation proceeds; they cannot get better title than what Trans-American possessed. The creditors, therefore, have rights only to TransAmerican's portion of the settlement proceeds.

### 15. *Damages.*

Terry seeks to recover its damages under the contract. In the alternative it has said it would accept a transfer of an interest in the La Perla minerals equal to its damage amount. Terry will receive a judgment for its damages as the contract prescribes, so the additional complications of converting the damages into a mineral interest will not be discussed.

The unilateral disposition of Terry's interest in the El Paso contract is a default. This default is covered by the remedy that allows Terry to convert its account from a non-recourse interest in production to a direct liability of TransAmerican. See Drilling Agreement § 11.8.

Not every breach of the contract or default would trigger the conversion, but Trans-American took $302 million in cash and a $58 million mineral interest in derogation of Terry's real property interest. As admitted in court, TransAmerican itself values Terry's interest in the El Paso contract settlement at about $17 million. As a matter of law, this interference with Terry's rights is sufficient in character and magnitude to entitle it to full recovery of the account with recourse. Terry had an express contract right to $5.90 per MCF, and TransAmerican received compensation of $360 million for lowering the price of Terry's gas to $1.20 per MCF. Trans-American has denied Terry's title.

### 16. *Value of the Settlement.*

TransAmerican has treated the $58 million value of the La Perla mineral interest as a net gain above its existing interest in the minerals under the earlier farmout with El Paso. TransAmerican has consistently reported that as a *net* value. Although it argued that the value of the earned acreage and the future drilling rights under the farm-out should be subtracted from the $58 million value of the La Perla mineral interest it acquired from El Paso, it offered no summary judgment evidence to contradict its published financial position.

In January 1990, the value of the cash part of the settlement was, of course, simply $302 million. The value of the mineral interest transferred from El Paso to TransAmerican was $58 million.

### 17. *Verdict or Settlement.*

TransAmerican took a judgment for $480,-309,341 that included Terry's interest. TransAmerican settled that judgment for 63.84% of its face value. TransAmerican accepted the lower payment for reasons of its own, without Terry's participation. Trans-American has admitted that the judgment was collectable and that it could have been fully collected. TransAmerican's compro-

mise with El Paso was for its own account and hostile to Terry. The value of Terry's interest in the El Paso settlement is not reduced by the wrongdoer's rush to cash. The adjudicated value binds TransAmerican.

TransAmerican asserts that the contract was not adversely taken by TransAmerican because El Paso had repudiated it, but it was for that precise wrongful repudiation that TransAmerican got a judgment. Terry's rights under the El Paso contract may have been delayed by El Paso's wrong, but in effect, TransAmerican collected the proceeds of the contract and kept Terry's share.

## 18. *Inequitable Pricing.*

In the deal that Terry made with Trans-American in the drilling contracts, Trans-American agreed that the price Terry charged would be its cost plus a substantial additional charge. The Terry–TransAmerican surcharge was higher than what would have been the usual amount of a contractor's increase of his costs in a simple secured cash-for-service transaction. The high surcharge was an integral part of the deal because it served as a risk premium, compensating Terry for the likelihood that the production from the wells it drilled would not be enough to pay its direct and indirect costs.

The existence of a risk premium in the pricing does not make the resort to full recourse a penalty. The banks suggest it is inequitable for Terry to convert its non-recourse account balance to a full recourse obligation because the pricing of the services carried a high risk premium that it would not obtain in a full recourse commercial account. In 1984 or 1987, TransAmerican could not have entered into a normal commercial deal because it was broke, and those who had extended it credit in its earlier incarnation had been stiffed. Terry agreed to accept the risk of insufficient production only as long as TransAmerican did not jeopardize the source of the production payment. See Drilling Agreement §§ 11.8, 12.1.

Also, when Terry agreed to accept the production as payment, the existing contract price that it acquired was $5.90 per MCF. Although at that price, the poor wells in the 1987 package still would not have paid the account balance; in effect, by stealing the $1.7 million attributable to Terry's 1987 interests in the El Paso contract, TransAmerican became responsible for the whole $26–million balance due. Without the provisions that allowed the production interest to be converted on default, the risk premium would have been higher or the production dedicated would have been larger.

## 19. *Subrogation and Security.*

If Terry could not convert its full account into a direct obligation of TransAmerican, Terry is still entitled to receive its share of production from those two groups of wells valued at the El Paso contract price of $5.90 per MCF. At that price, the production attributable to Terry is $40,581,485 for the 1984 wells and $2,376,194 for the 1987 wells. TransAmerican has taken Terry's $5.90 gas and wants to substitute $1.20 gas in the calculation of the payments due Terry from the wells.

Although Terry's interest in the La Perla minerals is limited to payment from the six wells, it should receive a security interest in the whole tract. The title interest in the specific wells arose at the time of the contracts, and the equitable lien on the rest of the tract will have vested on the date of Terry's *lis pendens*. Also, Terry has been asserting a title interest in the tract, and its title interest was used to discharge liens on the whole, subrogating Terry to the position of the paid lien claimants.

## 20. *The Numbers.*

Terry will recover from TransAmerican $16,323,816.20 on the 1984 drilling contract and $26,627,766.60 on the 1987 drilling contract, plus attorneys fees and costs of court. Terry will recover a first-lien security interest in the La Perla mineral interest of Trans-American. Terry will receive interest at the contract rate of 10.25% after February 1, 1996.

## 21. *Conclusion.*

Once property is transferred with court approval from a bankruptcy estate, it cannot

later be manipulated by the bankruptcy process. Terry entered into a court-approved post-petition contract with a debtor in possession. The contract was signed, approved, performed, and confirmed.

Under the plain language of the contracts, when TransAmerican impedes Terry's rights to the production, Terry can recover from TransAmerican the full drilling cost with recourse against TransAmerican at the contract prices. It will.

A judgment will be entered that Terry recover its full account balances from TransAmerican, attorneys' fees, interest, and a lien on the La Perla minerals. The judgment will be severed from the issue of TransAmerican's claim for over-charges and from the liquidation of the attorney's fees.